# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Cr. ID. No. 1802015485 |
| | ) | |
| | ) | |
| TAMEKE WRIGHT, | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: November 7, 2022
Decided: January 24, 2023

## COMMISSIONER'S REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF SHOULD BE DENIED

Diana Dunn, Deputy Attorney General, Department of Justice, Wilmington, Delaware, Attorney for the State.

Tameke Wright, Baylor Women's Correctional Institution, New Castle, Delaware, *pro se*.

Patrick Collins, Esquire and Kimberly Price, Esquire, Collins & Price, Wilmington, Delaware, postconviction counsel for Defendant.

**O'CONNOR,** Commissioner

This 24th day of January, 2023, upon consideration of Defendant's Motion for Postconviction Relief and the record in this matter, the following is my Report and Recommendation.[1]

## I.  BACKGROUND FACTS

On February 17, 2018, officers from the Wilmington Police Department responded to Wilmington Hospital for a report of a deceased baby.[2] The baby, fifteen-month-old C.S., was transported to the hospital by Defendant Temeke Wright ("Wright"), her co-defendant, Lavar Harris ("Harris"), and two other individuals.[3] When C.S. arrived at the hospital, hospital staff attempted to administer aid, but their efforts were unsuccessful, and C.S. was pronounced deceased at 0421 hours.[4]

The responding police officers observed multiple injuries to the baby, including numerous bruises and scratches to C.S.'s head, face, arms, chest, back and abdomen.[5] Wright and Harris told hospital staff that C.S. had fallen off of a futon and was found lying down face first on the apartment floor.[6]

The Chief Medical Examiner from the Delaware Division of Forensic Science performed an autopsy on C.S. and issued an Autopsy Report ("Report"). According

---

[1] This postconviction case was re-assigned to Commissioner Martin O'Connor on November 7, 2022. Docket Item ("DI") 79.
[2] Appendix to Memorandum in Support of Motion to Withdraw, Adult Complaint and Warrant ("App'x") at A13 (DI 62).
[3] *Id.*
[4] *Id.* at A13-A14.
[5] *Id*. at A14.
[6] Preliminary Hearing Transcript ("Prelim. Hr'g Tr.") at 8:10-20 (DI 2).

to the Report, C.S. exhibited "sustained bruising on the majority of his body from [the baby's] head all the way down to his ankles on the front side and the back side of his body."[7]  The Chief Medical Examiner concluded C.S.'s cause of death was homicide  resulting from blunt force trauma.[8]

The Wilmington Police Department's investigation into C.S.'s death revealed that Wright and Harris were babysitting C.S. for more than a week at 325 East 5th Street, Wilmington, Delaware.[9]  Several other people were also in the apartment with Wright, Harris, and C.S. during the time Wright and Harris babysat C.S., and up until the time he was brought to the hospital on February 17, 2018.  These other individuals saw Wright and Harris slap and punch C.S. and force C.S. to stand near a bed in the apartment for hours at a time.[10]  If C.S. would try to sit down or walk away from the bed, Wright and Harris would strike him.[11]  At one point, Harris told

---

[7]  *Id*. at 10:8-12.  The examination revealed the following blunt impact injuries: diffuse scalp contusion; forehead hematoma; occipital bone fracture; occipital epidural hematoma; bilateral subdural hematoma; bilateral optic nerve hemorrhage; bilateral retinal hemorrhage; abdominal wall contusion; right perinephric and periadrenal hemorrhage; subcutaneous contusions to back and buttock; contusions to upper and lower extremities; extra-axial hemorrhage over the left frontal, parietal and occipital lobes; bulging of optic discs; and right adrenal hemorrhage. C.S. also suffered from a fractured skull.  June 12, 2019 State's sentencing memorandum, Exhibit C, Findings and Opinions of Gary L. Collins, M.D., Autopsy of C.S., Delaware Division of Forensic Science, Case No. 2018-N-0447 ("Report") at 1 (DI 30).
[8]  Report at 1.
[9]  Prelim. Hr'g Tr. at 6:16-27, 7:15-20.  C.S.'s mother told the police that Wright and Harris would watch C.S. so she could spend time with her boyfriend and friends.  *Id.* at 7:6-11.  On other occasions, Wright would ask C.S.'s mother if she could babysit him.  *Id.* at 7:11-14.
[10]  *Id*. at 13:2-5.
[11]  *Id*.

Wright that C.S. stopped crying when he was being hit,[12] and Wright told Harris was not doing it correctly, he had to smack C.S. in the back of the head to get him to cry.[13] Harris then violently struck C.S. several times in the back of the head, and C.S. cried.[14]

On another occasion, Harris picked up C.S. by one arm and repeatedly punched him as he held him in the air.[15] And, just hours before C.S. was brought to the hospital, as C.S. sat on the apartment floor, Wright pushed the back of the baby's head forward in between his legs, causing the baby's head to strike the floor.[16] Then, with C.S.'s upper body bent forward on the floor, Wright stepped on the baby's back.[17] For the next few minutes, Wright stood on top of C.S. with her other leg suspended in the air.[18] Wright stood on C.S., in this fashion, twice.[19]

Another person in the apartment reported seeing bruises on C.S.'s chest, back and thighs; black eyes; a lacerated lip; and handprint impressions on his arms and legs.[20] They also found C.S., late at night, asleep on a dirty rug on the bathroom floor wearing only a diaper, without a blanket or pillow.[21] On one occasion, Wright

---

[12] *Id*. at 15:1-4.
[13] *Id*. at 15:4-7.
[14] *Id*. at 15:7-10.
[15] *Id*. at 14:18-20.
[16] *Id*. at 12: 13-17; *see also* App'x at A15.
[17] Prelim. Hr'g Tr. at 12:17-19; App'x at A15.
[18] Prelim. Hr'g Tr. at 12:17-19; App'x at A15.
[19] Prelim. Hr'g Tr. at 12:17-19; App'x at A15.
[20] Prelim. Hr'g Tr. at 12:17-19.
[21] *Id*.

and Harris put C.S. into a cold shower for 10-15 minutes. When asked why they put C.S. in the cold shower, Wright and Harris explained "they wanted to shock him and let the water beat on his bruises so that [the bruises] would go down so [they] could return him back to his mother."[22]

On February 18, 2018, Wright was interviewed by the police. Contrary to her initial report to hospital staff that C.S. had been found after falling off a futon, Wright blamed Harris for C.S.'s injuries. Wright said Harris pulled down the baby's diaper and struck him several times with a belt and a remote control device,[23] and told the police Harris picked up C.S. by one arm and, while holding him in the air, punched him several times in the chest yelling "shut up, shut up, you're not going to sleep."[24]

On another occasion, Wright claimed Harris told her he put the baby in a cold shower for 10-15 minutes to keep him awake.[25] Wright saw Harris strike C.S. in the back of the head, and C.S. then fall, hitting his head on the concrete floor.[26] Finally, Wright claimed Harris stood with his full weight on the baby's back after he pushed the baby's head and upper body between his legs while C.S. sat on the apartment floor.[27]

---

[22] *Id.* at 13:14-19.
[23] App'x at A15.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.* Wright initially admitted to striking C.S. once, but she later conceded she struck him three to five times. *Id.* at 14:8-11. She also admitted having been the person who stepped on C.S.'s back for a period of time, but also claimed Harris made her do it. *Id.* at 14:11-13.

The police also interviewed Harris. After initially suggesting he was unaware of any injuries to C.S.,[28] Harris eventually blamed Wright for C.S.'s injuries, recounting that he saw Wright strike the baby numerous times and step on C.S.'s back with her full weight on the baby.[29]

## II.   PROCEDURAL HISTORY

On May 17, 2018, a New Castle County Grand Jury indicted both Wright and Harris each for one count of Murder by Abuse or Neglect First Degree.[30]

On January 29, 2019, Harris accepted a plea to Murder By Abuse or Neglect First Degree and agreed to testify against Wright.

On February 1, 2019, Defendant Wright pled guilty to one count of Murder by Abuse or Neglect First Degree.[31] In exchange for the guilty plea, the State agreed not to seek a natural life sentence at sentencing.[32] Wright's sentencing was deferred pending a Presentence Investigation.[33]

---

[28] *Id*. at 15:14-17.
[29] *Id*. at 16:3-9.
[30] In Count I of the Indictment (DI 28), Wright was charged with the following offense:
    **MURDER BY ABUSE OR NEGLECT FIRST DEGREE**, in violation of Title 11, Section 634 of the Delaware Code.
    **TAMEKE WRIGHT**, on or about the 17th day of February, 2018, in the County of New Castle, State of Delaware, did recklessly cause the death of C.S., a child, through an act of abuse or neglect.
[31] The lone condition noted on the plea agreement was that State would not seek a natural life sentence at Wright's sentencing hearing. At the time of the plea, Wright was informed Harris had taken a plea and agreed to testify against her at trial. February 1, 2019 Plea Colloquy Tr. at 2:15 – 3:1. (DI 29).
[32] App'x at A93.
[33] February 1, 2019 Plea Colloquy Tr. at 11:15-23 (DI 29).

6

On June 24, 2019, the Court sentenced Wright. At the conclusion of counsels' sentencing comments, the Court asked Wright if there was anything she wished to say before her sentence was imposed.[34] She replied "no."[35] The Court acknowledged the existence of several mitigating factors, but concluded what happened to C.S. was an "absolutely despicable crime. . . as significant and horrific case" as the Court had ever seen. The Court noted "the slow, steady progression . . . of torment and torture" upon C.S. during the final week of the baby's life, and said:

> [T]he aggravating factors are significant . . . the excessive cruelty. The need for incarceration. It would unduly depreciate the offense, I think, just for the defendant to be given quote, unquote, 15 years. That's a long time, I'm not saying that's not, you know, some kind of a long sentence in and of itself.
>
> But one of the functions of sentencing is – and there are many purposes of it is to send a message to the community that if somebody is going to undertake this kind of intentional conduct, a very heavy price is going to have to be paid.
>
> And after considering this case at great length and giving all the best judgment that I can, I think the State's recommendation is sound of 35 years. It's just such a terrible crime.[36]

The Superior Court sentenced Wright to forty years Level V, suspended after serving thirty-five years, for six months Level IV probation, and eighteen months Level III probation.[37]

---

[34] June 24, 2019 Sentencing Tr. at 24:1-3 (DI 36).
[35] *Id.* at 24:4-5.
[36] *Id.* at 43:3-18.
[37] *Id.* at 43:1-44:2.

7

On June 25, 2019, the day after her sentencing hearing, the Court received a handwritten note from Wright. The note said: "I don't want the plea deal no more I want to take it to trial instead. I changed my mind."[38]

On November 26, 2019, Wright appealed her conviction and sentence to the Delaware Supreme Court asserting: (1) trial counsel was ineffective; (2) during the plea colloquy, Wright was coerced into pleading guilty and tried to withdraw her plea; and (3) the State violated its discovery obligations under Superior Court Criminal Rule 16 and *Brady v. Maryland*.[39] The Delaware Supreme Court affirmed Wright's conviction and sentence.[40]

On February 24, 2020, Wright filed a *pro se* Motion for Postconviction Relief,[41] claiming: (1) trial counsel failed to communicate with Wright and her grandmother; (2) trial counsel coerced her into entering the plea; and (3) her plea was neither knowing, intelligent, nor voluntary.[42] Wright claimed to have been unaware of the specific terms of the plea offer, and suggested her initial answer of

---

[38] June 10, 2019 Note from Defendant Tameke Wright to The Honorable Richard R. Cooch (DI 32).
[39] Wright's trial counsel filed a Rule 26(c) brief, and Wright presented what she believed to be meritorious appellate claims. *Wright v. State*, 2020 WL 411292 at *1 (Del. Jan 24, 2020). *See also Brady v. Maryland*, 373 U.S. 83 (1963).
[40] DI 45, February 11, 2020 Mandate from the Delaware Supreme Court affirming Defendant's conviction.
[41] DI 46, February 24, 2020 *Pro Se* Motion for Postconviction Relief.
[42] *Id*.

"no" during the plea colloquy is evidence that her plea was involuntarily entered.[43] Wright also argued counsel and the prosecutor engaged in a "cover up."[44]

On March 13, 2020, Wright filed a *pro se* Amended Motion for Postconviction Relief,[45] and on April 9, 2020, Wright filed a second *pro se* Amended Motion for Postconviction Relief.[46] In these filings, Wright claimed counsel was ineffective because her first interview with the police was wrongly admitted into evidence; the State committed a *Brady*[47] violation; the State failed to comply with Superior Court Criminal Rule 16 and did not provide discovery in a timely manner; and Wright should have been permitted to withdraw her guilty plea pursuant to Superior Court Criminal Rule 32(d).

On April 20, 2020, Wright requested the assistance of postconviction counsel,[48] and on August 24, 2021, the Court appointed postconviction counsel.[49] On April 1, 2022, postconviction counsel filed a Motion to Withdraw pursuant to Superior Court Criminal Rule 61(e), concluding, after a review of the record, that

---

[43] *Id.*

[44] *Id.*

[45] March 13, 2020 Am. to Mot. for Postconviction Relief (DI 50). The amendment states "Plea was not knowingly, willingly and intelligently taken. Tameke Wright replied 'no' to Judge Cooch's question of the plea and crime." *Id.*

[46] April 9, 2020 Am. to Mot. for Postconviction Relief (DI 51) (in this amended motion for postconviction relief, Wright attached the same claims she submitted to the Delaware Supreme Court in her direct appeal).

[47] 373 U.S. 83 (1963).

[48] April 20, 2020 Letter from Defendant requesting appointment of postconviction counsel (DI 52).

[49] September 28, 2020 Order for appointment of postconviction relief counsel (DI 55).

postconviction counsel did not identify any meritorious claims to raise on Wright's behalf.[50]

On May 31, 2022, the Court received trial counsel's affidavit in response to Wright's postconviction motion. Therein, trial counsel represented he did discuss trial strategy with the defendant, he did speak to her grandmother about the case, he did not have an independent recollection of the plea colloquy, and does not believe he told Wright that if she did not take the plea, she would get a life sentence.[51]

On June 15, 2022, the Court docketed an Affidavit from Flora Wallace ("Wallace"), Wright's grandmother. Wallace's affidavit concedes counsel met with her and Wright, but also states Wallace did not believe trial counsel was fighting for Wright.[52]

On June 30, 2022, the Court docketed Defendant's Affidavit in response to trial counsel's May 31, 2022 Affidavit. In the Affidavit, Defendant generally alleges trial counsel repeatedly attempted to convince her to take the plea offer, contrary to her statements to the Court during the February 1, 2019 plea colloquy.[53]

On June 28, 2022, the Delaware Department of Justice filed the State's Response to Defendant's Motion for Postconviction Relief.[54] The State asserted the

---

[50] DI 61.
[51] May 31, 2022 Affidavit of Counsel in response to Wright's postconviction motion (DI 67).
[52] June 10, 2022, Affidavit of Flora Wallace (DI 68).
[53] DI 75; Affidavit of Tameke Wright filed in response to counsel's May 31, 2022 Affidavit (DI 67).
[54] DI 74.

record does not support Defendant's claim that counsel provided deficient representation; Wright's claim of coercion is procedurally barred as previously adjudicated pursuant to Rule 61(i)(4), Wright has failed to allege counsel was ineffective in representing Wright, and the record does not support her claim.

On August 3, 2022, Wright responded to the State's June 22, 2022 submission.[55] Wright's claims are ripe for decision.

## III. MOTION FOR POSTCONVICTION RELIEF

Wright's case resulted in a plea, not a trial. In order to prevail on an ineffective assistance of counsel claim in the context of a guilty plea, a defendant must show that counsel's representation fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unprofessional errors, Wright would have insisted on going to trial, and that trial would have resulted in an acquittal.[56] There is a strong presumption that trial counsel's representation was competent and fell within the "wide range" of reasonable professional assistance.[57] "The standard for judging counsel's representation is a most deferential one,"[58] because trial counsel "observed the relevant proceedings, knew of materials outside the record, and interacted with the

---

[55] DI 85.

[56] *State v. Johnson*, 2013 WL 5883211 (Del. Super. Aug. 16, 2013) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

[57] *Premo v. Moore*, 562 U.S. 115, 122-23 (2011); *see also Flamer v. State*, 585 A.2d 736, 753-44 (Del. 1990) (citations omitted).

[58] *Premo,* 562 U.S. at 122.

client, with opposing counsel, and with the judge."[59]  "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."[60] As such, mere allegations of ineffective assistance will not suffice; instead, Wright must make concrete allegations of ineffective assistance, and substantiate them, or risk summary dismissal.[61]  Deference must be given to defense counsel's judgment in order to promote stability in the process.[62]

To overcome the strong presumption that counsel provided competent representation, Wright must demonstrate, by clear and convincing evidence, that "counsel failed to act reasonabl[y] considering all the circumstances" and that the alleged unreasonable performance prejudiced the defense, i.e., in this case, that Wright would have insisted on going to trial and been acquitted of all charges.[63]

Because a defendant must prove both parts of an ineffectiveness claim, this Court may dispose of a claim by first determining that the defendant could not establish prejudice.[64]  The first consideration in the "prejudice" analysis "requires more than a showing of theoretical possibility that the outcome was affected."[65]

---

[59] *Id.*
[60] *Id.* (citing *Strickland*, 466 U.S. at 690).
[61] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).
[62] *State v. Fithian*, 2016 WL 3131442, at * 3 (Del. Super. May 25, 2016) (citing *Premo*, 562 U.S. at 120-122)).
[63] *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Strickland*, 466 U.S. at 688).
[64] *Strickland,* 466 U.S. at 697.
[65] *Frey v. Fulcomer*, 974 F.2d 348, 358 (3d Cir. 1992).

Wright must actually show a reasonable probability that, but for counsel's errors, she would have elected to go to trial and that trial would have resulted in an acquittal.[66]

## IV. PROCEDURAL BARS

In any motion for postconviction relief, this Court must first determine whether a defendant has satisfied the procedural requirements of Superior Court Criminal Rule 61 before giving consideration to the merits of the underlying claims.[67] Rule 61(i)(1) prohibits the Court from considering a motion for postconviction relief unless it is filed within the applicable time limitation.[68] Rule 61(i)(2) prohibits the filing of repetitive motions for postconviction relief, unless under 61(d)(2)(i), the movant "pleads with particularity that new evidence exists that creates a strong inference" of actual innocence; or, under Rule 61(d)(2)(ii),"that a new rule of constitutional law, made retroactive to cases on collateral review" applies to the movant's case.[69]

Rule 61(i)(3) provides that "any ground for relief that was not asserted in the proceedings leading to the judgment of conviction, as required by the rules of this

---

[66] *Strickland*, 466 U.S. at 695.
[67] *Taylor v. State*, 32 A.3d 374, 388 (Del. 2011) (quoting *Shelton v. State,* 744 A.2d 465, 474 (Del. 1999)).
[68] Super. Ct. Crim. R. 61(i)(1).
[69] Super. Ct. Crim. R. 61(i)(2).

Court, is thereafter barred, unless the movant shows (a) cause for relief from the procedural default and (b) prejudice from the violation of movant's rights."[70]

Rule 61(i)(4) provides that "[a]ny ground for relief that was formerly adjudicated, whether in the proceedings leading to the judgment of conviction, in an appeal, in a postconviction proceeding, or in a federal habeas corpus proceeding, is thereafter barred."[71]

Rule 61(i)(5) provides that any claim barred by Rule 61(i)(1)-(4) may nonetheless be considered if the claim is jurisdictional or otherwise satisfies the pleading requirements of Rule 61(d)(2)(i) or (d)(2)(ii).[72]

This is Wright's first Motion for Postconviction Relief, and it was timely filed, so the procedural bars of Rule 61(i)(1) and 61(i)(2) do not apply. But, pursuant to Rule 61(i)(3), the following claims are procedurally barred because Wright did not assert any of them leading up to the judgment of conviction, and Wright has not established the cause and prejudice required by the Rule: (a) trial counsel coerced her into entering the plea;[73] (b) counsel and the State engaged in a "cover up;" and (c) Wright's first police interview was improperly admitted into evidence.

---

[70] Super. Ct. Crim. R. 61(i)(3).
[71] Super. Ct. Crim. R. 61(i)(4).
[72] Super. Ct. Crim. R. 61(i)(5).
[73] *See Kalil v. State*, 2014 WL 2568029 at *2 (Del. June 5, 2014); *State v. Gomez*, 2014 WL 8042732 at *4 (Del. Super. Dec. 4, 2014).

Pursuant to Rule 61(i)(4), the following claims are procedurally barred because they were formerly adjudicated on direct appeal: (a) the State committed a *Brady* violation; (b) the State failed to provide discovery in a timely manner; and (c) the Court erred in not permitting her to withdraw the guilty plea pursuant to Superior Court Criminal Rule 32(d).[74]

That leaves the ineffective assistance of counsel claim.

## V.    DEFENDANT'S POSTCONVICTION CLAIMS.

Wright has alleged one ineffective assistance of counsel claim, as well as several procedurally barred claims. The ineffective assistance of counsel claim will be addressed first, and the remaining claims will then be addressed based on the assumption that the aforementioned procedural bars do not foreclose consideration of those claims. As indicated *infra*, those remaining claims are not only procedurally barred, but they fail on their merits. Each of Wright's claims are addressed below.

**A. Ineffective Assistance of Counsel claim: Wright claims that counsel failed to communicate with her; and that the plea was not knowingly, intelligently or voluntarily entered.**

Wright claims counsel did not communicate with her in preparation for trial and the plea, counsel did not review with her the terms of the plea, and therefore her plea was not knowingly, intelligently or voluntarily entered. She also alleges counsel ignored her intent to reject the plea and go to trial, and the evidence

---

[74] *See Wright*, 2020 WL 411292 at *2.

supporting her claim is the initial "no" answer when the Court asked during the plea colloquy if she committed Murder By Abuse or Neglect First Degree.[75] The record does not support Wright's claims.

During the February 1, 2019 plea colloquy, prior to the entry of the plea, trial counsel, in Wright's presence, informed the Court he had discussed the Plea Agreement and TIS Form with Wright on January 30, 2019 and on February 1, 2019.[76] Counsel explained that Wright understood the terms of the plea and the statutory penalties for the offense, and he would ask the Court to impose no more than the minimum sentence of fifteen years at sentencing. Counsel had also previously advised Wright it was likely the State would ask for more than fifteen years in prison, and the Court was not bound by either parties' sentencing request.[77] Counsel told the Court Wright was entering the plea knowingly, intelligently and voluntarily, and it had been "her desire to accept this plea for a long time and to not try this case for several weeks . . . ."[78] Counsel also informed the Court that Wright was being pressured by people very close to her to reject the plea offer.[79]

---

[75] February 1, 2019 Plea Colloquy Tr. at 10:10.
[76] *Id.* at 3:5-10.
[77] *Id.* at 3:16-19.
[78] *Id.* at 3:21-4:2.
[79] *Id.* at 3:23-4:4. At sentencing, counsel also informed the Court:

> She took the lead charge. She took the only charge in this case. And she took the plea under circumstances in which she had a lot of people really close to her who were imploring her really, really strongly and going to really extreme measures to try to make sure she didn't take the plea. She took the plea because she knew it

16

The Court began Wright's plea colloquy by reviewing with her the TIS Guilty Plea Form. Wright confirmed she signed the TIS Form after reviewing it carefully with her attorney, and acknowledged she "freely and voluntarily decided to plead guilty to the charge listed in [her] written plea agreement."[80] Wright denied that she had been forced or threatened by the State, her attorney or any other person to enter the plea,[81] and agreed she was not promised what her sentence would be. Wright understood the State would not request a life sentence, but the prosecutor's recommendation was not limited to the minimum mandatory fifteen-year sentence. She also understood that regardless of the parties' respective sentence recommendations, the Court retained discretion to sentence her to any amount of Level V time, from fifteen years to life imprisonment."[82]

Wright expressly told the Court she was satisfied with counsel's representation, counsel fully informed her of her rights, and she executed the plea agreement after reviewing it thoroughly.[83] Then, the following exchange occurred:

> **The Court:** The charge against you reads as follows and because there was a – or excuse me. It's Count 1, Criminal Action Number ending in 0226, and it reads that you on or about the 17th day of February, 2018

was the right thing to do, it was what she wanted to do and she wanted to take responsibility for her conduct. And I'm asking that that get weight in this case, Your Honor.

June 24, 2019 Sentencing Tr. at 20:1-11.
[80] February 1, 2019 Plea Colloquy Tr. at 5:4-7, 5:18-22.
[81] *Id.* at 6:3-5.
[82] *Id.* at 7:23-8:8.
[83] *Id.* at 9:21-10:1.

in this County and State, did recklessly cause the death of C.S., a child, through an act of abuse or neglect of such child. Did you commit that offense?

**The Defendant:** No, Your Honor.

**The Court:** No, my question to you was, you're charged with Count 1 with murder by abuse or neglect first degree, and it reads, the indictment does, that on February 17, 2018, in the County of New Castle, State of Delaware, you did recklessly cause the death of C.S., a child, through an act of abuse or neglect of that child, and my question to you now is, did you commit that offense?

**The Defendant:** Yes, Your Honor. Yes, Your Honor.

**The Court:** Was your earlier answer "no" a mistake?

**The Defendant:** Yes.

**The Court:** Do you understand that what's being done today is final; meaning, you will not be able to come back at any later time to seek to withdraw this guilty plea?

**The Defendant:** Yes, Your Honor.

**The Court:** Do you believe you are knowingly, voluntarily and intelligently entering a plea of guilty to this charge?

**The Defendant:** Yes, Your Honor.

**The Court:** After what I hope is a thorough colloquy, including a careful observation of the defendant's demeanor and listening to all of her answers to all of the questions, I find that the defendant has knowingly, voluntarily and intelligently entered a plea of guilty to this charge. It is accepted. A presentence investigation is ordered. By law bail is revoked as to this charge.[84]

As this Court has repeatedly held, "[a] plea is knowing and voluntary when it is 'voluntarily offered by the defendant, [herself], with a complete understanding by [her] of the nature of the charge and the consequences of the plea, and the trial judge has so determined. A defendant is bound by the answers [she] provides on [her]

---

[84] *Id.* at 10:1-11:23.

18

truth in sentencing guilty plea form.'"[85]  Wright's plea was entered with a complete understanding of the offense to which she pled guilty, the statutory penalty range for the offense, and her constitutional rights.  She confirmed the plea was a knowing, intelligent and voluntary act, was satisfied with her attorney's representation, and acknowledged her attorney fully advised her of her rights.[86]  As to Wright's claim that her initial "no" answer is evidence of her intent to want to withdraw the plea, her explanation is not supported by the record.  Wright clearly articulated her "no" answer was a "mistake," immediately entered the plea, and did not seek to withdraw the plea until after she had been sentenced, more than five months later.  Moreover, during the plea colloquy the Court contemporaneously conducted "a careful observation of the defendant's demeanor and listening to all of her answers to all of the questions."[87] Wright's plea was knowingly, voluntarily and intelligently entered, and she cannot demonstrate counsel's performance was deficient, nor can she establish prejudice.

---

[85]  *State v. Benson*, 2022 WL 2073342, at *5 (Del. Super. June 6, 2022) (quoting *Shorts v. State*, 2018 WL 2437229, at *4 (Del. May 30, 2018)).
[86]  Plea Colloquy Tr. at 5:18-20, 8:20-23.
[87]

**B. Wright's police interview was improperly admitted into evidence.**

Wright claims her first interview with detectives was improperly admitted into evidence, but there was no trial, and so no interviews were admitted into evidence. Wright's claim is factually baseless and meritless.

**C. *Brady* and Discovery violation claims**

Wright alleges the State did not fulfill its discovery obligations, by failing to comply with Superior Court Criminal Rule 16 and *Brady v. Maryland*.[88]  Wright does not identify *any* evidence, exculpatory or otherwise, in the possession of the State which was withheld from the defense.  Wright's claim is, at best, vague and conclusory.

**D. The attorney "cover up" claim.**

Wright alleges the prosecutor and trial counsel engaged in a "cover up."  The evidence Wright provides of a "coverup" is a series of post-sentencing motions filed by herself and her counsel, as well as the State's responses to those motions.

On September 20, 2019, Wright filed a *pro se* Motion for Modification of Sentence.[89]  On September 23, 2019, Wright's counsel filed a Motion for Reduction

---

[88] 373 U.S. 83.
[89] DI 39.

of Sentence.[90]  The State opposed any sentence modification.[91]  Wright's suggests neither the Court nor the State addressed her *pro se* Motion for Sentence Reduction/Modification and this post-sentence motion practice constitutes a postconviction claim.  It does not.

Post-sentencing motions for sentence reduction are common and appropriate, particularly when they are timely filed pursuant to Superior Court Criminal Rule 35. Counsel's attempt to reduce Wright's sentence does not constitute a postconviction claim.

Moreover, on December 4, 2019, the Court denied both Wright's *pro se* Motion for Sentence Reduction/Modification and Defendant's Motion for Reduction of Sentence.[92]  The Court's decision to consider Wright's *pro se* motion as being "effectively subsumed in Defense counsel's Motion of September 20" is consistent with the Court's treatment of other *pro se* filings when a *represented defendant* files

---

[90] DI 40.  Counsel's Motion requested two things:  (1) a five-year reduction in sentence, and (2) a request that the Court retain jurisdiction over Defendant's sentence after she serves 15 years imprisonment, presumably so she could file a Rule 35 Motion for Sentence Reduction after completing the fifteen year mandatory term of imprisonment for Murder by Abuse or Neglect First Degree. *Id.*

[91] September 24, 2019 Letter from the State to the Court responding to counsel's Motion for Reduction of Sentence and Motion for the Court to retain jurisdiction over Defendant's sentence after she serves 15 years imprisonment (DI 41).

[92] December 4, 2019 letter from the Court to the State and defense counsel denying the Motion for Sentence Modification (DI 44).  The Court did not take specific action on Defendant's *pro se* Motion for Reduction/Modification of Sentence, as it concluded the Motion was "subsumed in Defense counsel's Motion of September 20." *Id.* at 2.

motions without counsel's knowledge or participation.[93] Counsel's post-sentencing motion was appropriately and timely filed, and the Court considered Wright's *pro se* motion when it denied counsel's Motion for Reduction of Sentence.

Wright's allegation of a "cover up" is speculative, conclusory and without merit.

### E. Wright was coerced into entering the plea.

Wright alleges she was coerced into entering the plea. Wright claims that when counsel met with her prior to the plea, he yelled at her to take the plea, and told her if she did not take the plea, she would receive a life sentence. Wright's postconviction claims are not supported by the record, and in fact, the plea colloquy transcript squarely contradicts her claim, as she represented she was fully advised of her rights, was satisfied with counsel's representation, and she knowingly, voluntarily and intelligently pled guilty. Wright also *explicitly denied* being forced or threatened to enter the plea.[94] Her claim of coercion is meritless and is unsupported by any credible evidence.

---

[93] *See* Super. Ct. Crim. R. 47 ("The court will not consider *pro se* applications by defendants who are represented by counsel unless the defendant has been granted permission to participate with counsel in the defense.")

[94] Plea Colloquy Tr. at 6:3-5.

**F. The Motion to Withdraw Guilty Plea pursuant to Rule 32(d).**

Wright claims she should have been permitted to withdraw the guilty plea pursuant to Superior Court Criminal Rule 32(d). Superior Court Criminal Rule 32(d) provides:

> *(d) Plea Withdrawal*
> If a motion for withdrawal of a plea of guilty or nolo contendere is made before imposition or suspension of sentence or disposition without entry of a judgment of conviction, the court may permit withdrawal of a plea by a showing by the defendant of any fair and just reason. At any later time, a plea may be set aside only by motion under Rule 61.

In limited circumstances, the Court has discretion when deciding whether to allow a defendant to withdraw a guilty plea after it has been entered, but before a defendant is sentenced. But, after a defendant is sentenced, Rule 32 provides that a defendant may only be considered for a motion to withdraw a guilty plea in the context of a motion for postconviction relief. Here, because Wright had already been sentenced when the Court received her note, the issue of withdraw of the guilty plea may only be collaterally attacked in the context of a Rule 61 motion.[95]

The Court received Wright's handwritten note on June 25, 2019, the day after her sentencing hearing, wherein she wrote: "I don't want the plea deal no more I want to take it to trial instead. I changed my mind."[96]

---

[95] See Super. Ct. Crim. R. 32(d).
[96] June 10, 2019 Note from Defendant Tameke Wright to The Honorable Richard R. Cooch.

First, a defendant's change of mind is not a reason to vacate an otherwise properly executed guilty plea.[97] Second, there is no evidence which would support a postconviction claim that counsel failed to file a timely motion to withdraw plea. Wright did not ask counsel to file a motion to withdraw prior to sentencing, Wright did not file a *pro se* motion to withdraw prior to sentencing, and at the June 24, 2019 sentencing hearing, neither Wright nor her attorney indicated she wanted to withdraw the February 1, 2019 guilty plea. In fact, the Court provided Wright an opportunity prior to the imposition of sentence to say anything on the record, and not only did she not ask to withdraw the guilty plea, she expressly declined the Court's offer to say anything at all.[98] The record does not support Wright's claim, and she cannot demonstrate prejudice.

Wright's motions collectively fail to establish that trial counsel's performance fell below constitutional standards, and she cannot demonstrate prejudice.

## VI. <u>CONCLUSION</u>

The State's case against Wright was very strong. Wright was responsible for C.S.'s care as she and Harris babysat him for more than a week. During an interview with the police, Wright admitted to striking C.S. three to five times while he was in her care, and to standing on his back as he was on the apartment floor. Wright also

---

[97] *State v. Lindsey*, 2002 WL 1463103, at *2 (Del. Super. May 21, 2002) (citing *State v. Marks*, 1999 WL 1611338 (Del. Super. Mar. 22, 1999)).
[98] June 24, 2019 Sentencing Tr. at 24:1-3.

24

admitted to witnessing Harris repeatedly strike C.S. while C.S. was in their collective care, and she did nothing to protect the baby. When C.S. was injured, Wright did not seek help, and her co-defendant agreed, as a condition of his plea, to testify against her.

The witnesses who saw both Harris and Wright assault C.S. were clear that both Wright and Harris were torturing C.S.. The Autopsy Report was damning. C.S. was internally and externally critically injured, from head to toe. C.S. was, as the sentencing judge noted, tortured and tormented during the final week of his young life. And, the *mens rea* required to convict Wright for Murder by Abuse or Neglect First Degree was *reckless*, not intentional, conduct. It is difficult, at best, to consider *any* scenario where Wright would have gone to trial and would have been acquitted, and Wright has not provided one.[99] Even assuming counsel provided ineffective representation (and Wright failed to demonstrate that he did), Wright has failed to demonstrate prejudice.

---

[99] Wright is required to make "concrete allegations of actual prejudice and substantiate them, or risk dismissal." *State v. Johnson*, 2013 WL 5883211, at *3 (Del. Aug. 13, 2013) (citing *Larson v. State*, 1995 WL 389718, at *2 (Del. June 23, 1995); *Younger*, 580 A.2d at 556. Wright has not established prejudice, as she merely asserted, without more, that counsel was ineffective. *Id*.

For all of the aforestated reasons, I recommend the Motion for Postconviction Relief should be **DENIED**.

Postconviction counsel's Motion to Withdraw should be **GRANTED.**

        **IT IS SO RECOMMENDED.**


/s/ Martin B. O'Connor
Commissioner Martin B. O'Connor

oc:    Prothonotary